J-S68015-17

2017 PA Super 373

| | | |
|---|---|---|
| IN RE: | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| ESTATE OF: MARCELLA MARIE | : | |
| MARSH | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: BRIAN MARSH | : | |
| | : | |
| | : | No. 743 MDA 2017 |

Appeal from the Decree Entered April 6, 2017
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  35-2013-00126

BEFORE:   LAZARUS, J., DUBOW, J., and STRASSBURGER*, J.

OPINION BY LAZARUS, J.:                    **FILED NOVEMBER 22, 2017**

Brian Marsh appeals from the decree entered in the Court of Common Pleas of Lackawanna County, Orphans' Court Division, denying his petition for disinterment of the remains of Marcella Marie Marsh, Deceased ("Decedent"). Upon careful review, we affirm.

Decedent died on July 28, 2013, at the age of 66, survived by three daughters, including Appellee Colleen Lizza, and one son, Appellant Marsh. Marsh was appointed administrator of Decedent's estate after obtaining renunciations from his sisters.  He subsequently agreed to resign as administrator after Lizza filed a petition to remove him from office.

On April 14, 2016, Marsh, in his individual capacity, filed a petition for disinterment of his mother's body.  Also in 2016, Marsh filed a wrongful death and survival action against Lizza, seeking damages related to Decedent's death.  In his disinterment petition, Marsh claimed that, while her death

_____
*   Retired Senior Judge assigned to the Superior Court.

certificate listed cardio-respiratory arrest as cause of death, Decedent had no history of heart problems, and he questioned whether her manner of death was, in fact, "natural," as stated on her death certificate. Because Decedent's body had not been autopsied, Marsh sought disinterment "to determine whether or not there is any reason sufficient to believe that the sudden death of the [D]ecedent may have resulted from the act or negligence of person or persons other than the deceased." Petition for Disinterment, 4/14/16, at ¶ 9.

Lizza filed a response to Marsh's petition, contesting his entitlement to relief. Specifically, Lizza asserted that

> [Marsh] has not articulated what potential acts of negligence were committed by what persons. [Marsh] has not articulated what theories of negligence exist[] and, even if they do exist, what the purpose of exhumation would be, [i.e.] lawsuit, monetary recovery, etc. As to the allegation that "the death of the [D]ecedent may have resulted from the <u>act</u> . . . of person or persons other than the [D]eceased," [Marsh] has failed to identify any alleged act or actor. Simply stated, [Marsh] has failed entirely to provide any reasonable basis for the disinterment.

Answer to Petition for Disinterment, 5/17/16, at ¶ 9 (emphasis in original).

The Orphans' Court held a hearing on December 8, 2016, at which time the court granted Marsh leave to orally amend his petition to include as a basis for disinterment Marsh's desire to perform genetic testing on the Decedent to discover any potential medical concerns that might affect Marsh or his offspring. Following the hearing and the submission of briefs, the court denied Marsh's petition by Decision and Decree dated April 6, 2017, in which the court concluded that it was "hesitant to set a precedent that allows for the

exhumation and autopsy of any individual simply because no autopsy was performed, or in the circumstance where an heir only becomes concerned with a Decedent's medical history years after the death of said Decedent." Orphan's Court Decision and Decree, 4/6/17, at 4. This timely appeal follows, in which Marsh raises the following question for our review:

> Whether the Orphans' Court committed an error of law and/or an abuse of discretion in denying [Marsh's p]etition since reasonable cause was shown for exhuming and autopsying the [D]ecedent, and the objective sought for requesting same could be achieved?

Brief of Appellant, at 3.

We begin by noting:

> [o]ur standard of review from a final order of the Orphans' Court Division requires that we accord the findings of an Orphans' Court, sitting without a jury, the same weight and effect as the verdict of a jury. Thus, we will not disturb those findings absent manifest error. We shall modify an Orphans' Court order only if the findings upon which the order rests are not supported by competent or adequate evidence or if the court engaged in an error of law, an abuse of discretion, or capricious disbelief of competent evidence.

*In re Ciaffoni*, 787 A.2d 971, 973 (Pa. Super. 2001).

With regard to the removal of a body from its final resting place, our Supreme Court has stated that "there is no universal rule applicable alike to all cases, but each must be considered in equity on its own merits, having due regard to the interests of the public, the wishes of the decedent, and the rights and feelings of those entitled to be heard by reason of relationship or association." *Pettigrew v. Pettigrew*, 56 A. 878, 880 (Pa. 1904).

- 3 -

As the Supreme Court made plain in **Pettigrew**, with regard to reinterment[1] there is "reserv(ed) always the right of the court to require reasonable cause to be shown for it." [**Id.**] at 880[.] In addition, the Court made plain that in deciding whether reasonable cause for reinterment had been shown, the lower court should take into account a variety of factors[.] Whether reasonable cause for reinterment has been shown will depend upon the respective weight, or persuasiveness, of these factors as they are all considered together[.]" **Id.**

**Novelli v. Carroll**, 420 A.2d 469, 472 (Pa. Super. 1980). Among the factors to be considered are: (1) the degree of relationship to the decedent of the persons in favor of and opposed to reinterment; (2) desire of the decedent, with the general presumption being that the decedent would not wish her remains to be disturbed; (3) the conduct of the persons seeking and opposed to reinterment; (4) the length of time that has elapsed since the original interment; and (5) the strength of the reasons offered both in favor of and in opposition to reinterment. **See id.** at 472-74. "If the person seeking or opposing reinterment does so to harass another, his case will be very weak." **Id.** at 474.

Here, Marsh argues that the Orphans' Court abused its discretion in denying his request for disinterment because his stated reasons for seeking exhumation constituted reasonable cause. He also asserts that the court utilized the improper standard, requiring Marsh to establish "good cause" rather than "reasonable cause." We find neither claim persuasive.

---

[1] The words "disinterment" and "reinterment" have been used interchangeably by the courts in the various cases involving the removal of a body from its final resting place.

When Marsh originally filed his petition, nearly three years after his mother's death, the stated purpose was his belief, not supported by any articulable facts, that his mother's death may have been caused by a "person or persons other than the deceased." Petition for Disinterment, 4/14/16, at ¶ 9. Although he did not name the "person or persons," shortly after filing his petition for disinterment, Marsh filed a wrongful death and survival action against Lizza in civil court.

In support of his petition for disinterment, Marsh obtained the expert opinion of Cyril Wecht, M.D., a renowned pathologist. Doctor Wecht submitted a written report, in which he noted that "[g]enetic predisposition is a significant factor in determining future medical testing, personal habits, dietary restrictions, physical activity, etc." Only after receiving Dr. Wecht's report did Marsh, on the day of the hearing, seek to amend his petition to add as a ground for disinterment his alleged interest in performing genetic testing on his mother's remains to benefit himself and his children.

In light of these facts and circumstances, we cannot say that the Orphans' Court abused its discretion in failing to find Marsh's arguments persuasive, particularly in light of the seemingly disingenuous nature of his "genetic testing" rationale. His own medical expert testified that the most likely cause of death was a natural one. *See* N.T. Hearing, 12/8/16, at 24. Although Dr. Wecht mentioned the possibility of trauma to the Decedent's body, that speculation was based solely on statements made by Marsh that the funeral director had told Marsh that Decedent's jaw and nose had been

broken. Under oath at his deposition, however, Marsh conceded that the funeral director never told him Decedent's jaw or nose were broken. Instead, Marsh stated that the funeral director told him his mother's nose "was pushed off to the side." N.T. Hearing, 12/8/16, at 26. Notably, Marsh did not call the funeral director to testify as to the condition of his mother's body. In any event, Marsh would have been aware of any statements made to him by the funeral director in 2013, and could have requested an autopsy at that time.

Moreover, the cases upon which Marsh relies are all distinguishable on their facts and, therefore, fall short of convincing this Court to disturb the Orphans' Court's decision. In **Wawrykow v. Simonich**, 652 A.2d 843 (Pa. Super. 1994), the appellant filed a claim against a decedent's estate, alleging that her son was the child of the decedent. The trial court denied appellant's claim on the sole basis that there was no statutory or case law authorizing exhumation for the purpose of establishing paternity for inheritance purposes.

On appeal, this Court noted the following factors: appellant averred that she was the mother of the minor child and that the child was conceived at a time when the decedent was the only person with whom she had sexual relations; appellant listed the decedent as the father on the child's birth certificate; appellant averred that the child's appearance resembled closely that of the decedent; and blood groupings obtained from the putative paternal grandparents were determined to be "not inconsistent" with decedent's paternity. The Court concluded that "[a] party seeking DNA testing as a vehicle **to supplement his/her arsenal of evidence** to prove paternity

should not be denied access to such potentially probative evidence, provided, as is the case here, the petitioner satisfies the 'reasonable cause' criterion to warrant exhumation." *Id.* at 847 (emphasis added). Accordingly, as the trial court had not made a determination as to reasonableness, the matter was remanded for that purpose.

*Wawrykow* is distinguishable from the case at bar. In particular, in that case, the petitioner had significant other evidence supporting her claim that her son was, in fact, the child of the decedent. She sought DNA testing merely to "supplement" her already significant "arsenal of evidence." *Id.* In contrast, here, Marsh presented absolutely no evidence tending to prove that Decedent's death resulted from negligence, such that an autopsy could reasonably be deemed the logical next step in determining responsibility for Decedent's demise. Similarly, Marsh's alleged desire to perform genetic testing on his mother's body – itself an apparent afterthought – is supported by nothing more than speculation that one or more genetic conditions may be discovered.

Marsh also relies on *In re Dillon*, 674 A.2d 735 (Pa. Super. 1996). There, the decedent died as a result of a shotgun blow to the chest suffered while hunting with a family friend, from whose gun the shot was determined to have originated. At the time, decedent's death was ruled an accident. However, nearly twenty years later, pursuant to legal proceedings initiated by the coroner, the decedent's body was exhumed and reautopsied. The coroner

subsequently released a public announcement stating that the manner of death had been changed to homicide.

Following that announcement, the decedent's widow – who had subsequently married the man whose gun had killed the decedent – petitioned for another exhumation for the purpose of having three independent pathologists reautopsy the body. Petitioner grounded her request on her assertions that the publicity surrounding the coroner's homicide announcement had resulted in speculation that petitioner's new husband was responsible for decedent's demise. Petitioner argued that such speculation had resulted in great personal anguish and emotional distress to her and might possibly result in the loss of future income. The trial court denied her request.

On appeal, this Court concluded that the petitioner's testimony as to the emotional and psychological effects of the coroner's homicide finding, as well as the economic effects of the announcement, constituted reasonable cause. The Court also considered that the petitioner, as the surviving spouse of the deceased, had the "paramount right to possession and custody of a body and the concomitant right to control burial or other disposition." *Id.*, citing *Pettigrew*, *supra*.

In this case, Marsh's stated curiosity as to what caused his mother's death is less compelling than the situation faced by the petitioner in *Dillon*, in which her current husband had fallen under a cloud of suspicion for having murdered her first husband. Indeed, here, Marsh has placed his own sister under a similar cloud by filing a wrongful death and survival action alleging,

with no apparent basis other than personal animus, that she was responsible for their mother's death.  Moreover, unlike in **Dillon**, Marsh does not possess the "paramount right" to determine the disposition of his mother's remains.  Rather, he is but one of several surviving children of the Decedent, at least one of whom – Lizza – is opposed to disinterment.[2]  In sum, we do not find the circumstances present in the instant matter to be analogous to those in **Dillon**.

Finally, Marsh asserts that the Orphans' Court utilized the incorrect standard in making its determination.  Marsh alleges that the court required a showing of "good cause" when, in fact, the proper standard is "reasonable cause."  Marsh is entitled to no relief.

In support of this claim, Marsh relies upon **Novelli**, **supra**, in which this Court found that the trial court had erred in using "exceptional cause" as the standard for reinterment.  However, the Orphans' Court here did not apply an "exceptional cause" standard.  Rather, the court concluded that Marsh did not demonstrate "good" cause.  "Good cause" is defined as "[a] legally sufficient reason."  Black's Law Dictionary (10th ed. 2014).  The term "reasonable cause" lacks "a common definition.  Indeed, Black's Law Dictionary only defines reasonable cause by referring the reader to the term 'probable cause,' one most commonly applied in the criminal law context."  **Potts v. Step By Step, Inc.**, 26 A.3d 1115, 1121 n.2 (Pa. Super. 2011).  Black's Law Dictionary

---

[2] Decedent's remaining two daughters were not parties to this action.

defines probable cause as "[a] reasonable ground to suspect that a person has committed or is committing a crime" which "amounts to more than a bare suspicion but less than evidence that would justify a conviction." Black's Law Dictionary (10th ed. 2014). This Court has previously equated "good cause" with "reasonable cause" in the context of disinterment. *See Wawrykow*, 652 A.2d at 846 ("Instantly, in establishing cause (be it labelled 'reasonable,' 'good,' or 'substantial') for purposes of exhumation, we have of record the uncontested assertions of the appellant . . .") (internal citations omitted).

In light of the foregoing, we conclude that the court's reference to "good cause" was more a matter of semantics than substance, and that the court applied the proper standard to Marsh's claim. Indeed, it is clear from the court's opinion that it was aware of the standard applicable to disinterment/reinterment matters. Specifically, the court noted the duty of a reviewing court to consider "the reasonability of the request[] for exhumation." Orphans' Court Decision and Decree, 4/7/16, at 2. Accordingly, we find no merit to Marsh's assertion that the court applied the improper standard.

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/22/2017